John D. Bennett, S.
A unique fact in this proceeding to probate a destroyed will is the admitted recognition on the part of the decedent and her husband (the petitioner here) that her failure to make a will would affect both of them adversely although like the majority of our decedents, this did not impel her to employ an attorney to draw a will.
“ Q. Mr. Yanover, had you and your wife discussed the making of a will prior to her entering the hospital on December 8th? A. I would say for ten years prior to that we had discussed making a will. Both my accountant and my attorney were both after me, and I as a logical man Imew what I would be up against if there were no will.
“ Q. You knew what the law provided in the event she died intestate? A. That’s right.
“ Q. The very fact that so much property was put in her name would certainly be indicative of the need of a testamentary disposition, would it not? A. As far as I am concerned?
“ Q. For Mrs. Yanover. She understood that too, did she not? A. Mrs. Yanover honestly knew what would happen if she died without a will yes, the condition of her estate.”
Again, Mr. Finker, the decedent’s brother, testified to conversations with her in regard to drawing a will:
*129 “ Q. Did you say to her, ‘ You should have a will? ’ A. Yes. I said, ‘ You should make a will. ’ ‘ I am going to make it. ’ She was how a lot of people are: tomorrow, next week. That is what happened. But I knew her wishes. ’ ’
In prior decisions this court has had occasion to point out the desirability of educating the public as to the benefits to be derived from making a will and keeping it up to date (Matter of Doepfer, 10 Misc 2d 991, 993; Matter of Toolan, 6 Misc 2d 791, 794; Matter of Schultz, 152 N. Y. S. 2d 959, 963).
The instant case constitutes an illustration that affirmative knowledge of the unhappy consequences that result from the failure to make a will may not be sufficient motivation to make one. One fact is clear. The consequences that here result cannot be ascribed to anyone but the petitioner.
Section 143 of the Surrogate’s Court Act details the proof necessary (in addition to that required by other provisions of law) to prove a ‘ lost or destroyed will ”: “A lost or destroyed will can be admitted to probate in a surrogate’s court, but only in case the will was in existence at the time of the testator’s death, or was fraudulently destroyed in his lifetime, and its provisions are clearly and distinctly proved by at least two credible witnesses, a correct copy or draft being equivalent to one witness.”
Although due execution of the propounded instrument is questioned by the special guardian, the court will assume arguendo that the requirements of section 21 of the Decedent Estate Law were complied with.
No “ correct copy or draft ” is presented. It was therefore necessary for the provisions of the will to be “ clearly and distinctly proved by at least two credible witnesses ”.
The extent of the clarity with which the provisions of the alleged will are required to be demonstrated is stated in Matter of Breckwoldt (170 Misc. 883, 886): “It is, of course, the law that where a lost will is attempted to be proved by a purely testimonial demonstration both of the witnesses who are required to establish its contents, as distinguished from demonstrating the validity of its execution, must agree on the dispositive provisions of the document (Sheridan v. Houghton, 6 Abb. N. C. 234, 237; reported by memo, only, 16 Hun 628; affd. on other grounds, 84 N. Y. 643; Matter of Musacchio, 146 Misc. 626, 628; Matter of Ruser, 6 Dem. 31, 33) and be able to state them with sufficient definiteness to enable the contents of the will to be , inserted in the decree of probate. (Matter of Purdy, 46 App. Div. 33, 36; McNally v. Brown, 5 Redf. 372, 375.) ”
*130 Measured by the above criteria the testimony of the witnesses fails to meet the requirements of the statute. Mr. Bakin testified that he read the paper signed by the decedent on December 10, 1957, two days after its execution. Although he testified to the best of his recollection as to what he thought the provisions of the paper were, his description of the provisions of the document did not meet the requirement that the will be “ clearly and distinctly proved ”. For example, his recollection was that the alleged bequest of the property in New Haven, Connecticut, to the decedent’s son, Mitchell, was an outright gift, whereas according to Mr. Finker’s testimony, such bequest was conditional upon the son’s attaining the age of 21 years, and is contradicted by the “ copy ” annexed to the petition. Even if we assume that Mr. Bakin’s testimony is sufficient to qualify him as one of the “ credible witnesses ” required by the statute, this still leaves a requirement for a second credible witness. Mr. Finker’s testimony, if anything, is less “clear and distinct ’ ’. He testified that he merely ‘ glanced through ’ ’ the paper. In another portion of his testimony he stated: ‘ ‘ but I wasn’t particular about the wording ”. The word “ glance ” is defined in Webster’s New International Dictionary (2d ed., unabridged), as follows: “ a quick cast of the eyes; a quick or cursory look ”. Mr. Finker’s own characterization of his testimony is probably the most persuasive reason why the court should find that it does not meet the strict requirements of the statute. Mr. Finker is also quite sure that the decedent, while lying in a hospital bed, did not read the instrument aloud to the doctors who acted as witnesses, or to the other individuals assembled in the room: “ She didn’t read it out loud. I don’t remember her reading it out loud, but she read it. She read it and she signed it.”
The testimony of the two subscribing witnesses to the paper, Dr. Pearl and Dr. Cohn, does not qualify either of them as one of the two credible witnesses required. Both of them testified that they received their knowledge of the contents of the paper allegedly signed by the decedent from her own declarations as to what it contained. The following colloquy appears at page 12 of the stenographic minutes containing Dr. Pearl’s testimony:
“ Q. You did not read that paper, did you Doctor? A. No, sir.
“ Q. You are testifying to it by reason of your conversation with Mrs. Yanover? A. That is correct.”
Dr. Cohn’s testimony of the incident is as follows:
* ‘ Q. When you and Dr. Pearl came into the room, what happened? A. We actually went in on two occasions. On the first occasion we examined the patient.
*131 “ Q. And after that? A. On the second occasion Mrs. Yanover asked ns to witness her signature to a piece of paper in which she intended to dispose of her property.
“ Q. Did she tell you what that paper contained? A. In substance she said she wished to leave some house in Connecticut or New Haven to take care of her son, Mitchy, and she intended to leave the rest to her husband.”
However, even Dr. Cohn is quite certain he did not personally read the paper:
“ Q. Dr. Cohn, did you have an opportunity to look at this paper that was signed by the decedent and witnessed by yourself and Dr. Pearl? A. No, sir, I didn’t read the paper.
“ Q. Of your own knowledge you know nothing of its contents, is that so? A. That’s right.”
Even assuming that the declarations of the decedent made to the two doctors who acted as subscribing witnesses were sufficiently “ clear and distinct ” to prove the contents of the alleged will ( a fact not established by the testimony) the decedent’s declarations as to the contents of the will are inadmissible in this State (Matter of Kennedy, 167 N. Y. 163; Matter of Wintjen, 101 N. Y. S. 2d 606, 608). "While apparently in the majority of the States, declarations of the testator as to the contents of an alleged lost will are generally though not universally admissible (Ann. Proof of Contents of Lost Will, 126 A. L. B. 1139, 1149), such is not the rule in New York State (Matter of Kennedy, supra). Even where such evidence has been admitted without objection, it is still questionable whether such evidence satisfies the statutory requirements. As the court stated in Hatch v. Sigman (1 Dem. 519, 525): “ Declarations of deceased persons are always a dangerous kind of testimony, and are received and scanned with closeness and scrutiny, and, in the usual run of cases tried in a Surrogate’s court, are not even admissible, except as bearing upon the testator’s mental capacity; and it would be a marvelous stretch of the judicial functions to say that the reiteration of these statements can galvanize them into the ‘ two credible witnesses ’ provided for by the statute.” (See, also, Matter of Rokofsky, 111 N. Y. S. 2d 553, 556.)
Strict compliance with the statutory requirements for wills is the expressed policy of this State in order to guarantee the genuineness of the testamentary dispositions and prevent fraud. In Matter of Booth (127 N. Y. 109, 116) the Court of Appeals said: “ it is wiser to construe these statutes closely, rather than loosely, and so open a door for the perpetration of the mischiefs which the statutes were designed to prevent.” A determination *132 admitting the propounded instrument to probate would violate legislative intent and the necessity for strict adherence to the requirements of the statutes.
Finally, before admitting a will to probate, the Surrogate must be satisfied with the genuineness of the will and the validity of its execution (Surrogate’s Gt. Act, § 144). The testimony here adduced does not satisfy the court that a will in the purported form was executed, that its contents were as propounded, or that its provisions were ‘ ‘ clearly and distinctly proved by at least two credible witnesses ”. Probate is accordingly denied and the petition dismissed.
Settle decree on five days’ notice.